# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ANTHONY GARNER, JR,

    *Plaintiff,*

  vs.                                  Case No. 2:21-cv-02154-EFM

UNIFIED GOVERNMENT OF
WYANDOTTE COUNTY/KANSAS CITY,
KANSAS,

    *Defendant.*

## MEMORANDUM AND ORDER

Before the Court is Defendant Unified Government of Wyandotte County/Kansas City, Kansas ("Defendant")'s Motion for Summary Judgement. Plaintiff Anthony Garner brings claims for racial discrimination under 42 U.S.C. §§ 1981, 2000e-2 and age discrimination under 29 U.S.C. § 623(a).  Because Plaintiff fails to show that there is a genuine dispute of material fact as to whether he was treated less favorably than those not in his protected class, his prima facie claims fail.  Therefore, Defendant is entitled to summary judgment on both of Plaintiff's claims.

## I.      Factual and Procedural Background[1]

Plaintiff is a 57-year-old African American.  In 2008, Plaintiff began working for the Kansas City Board of Public Utilities ("BPU") as a Groundman Driver.  Plaintiff first allegedly experienced discrimination when he was denied entry into the first of two planned lead splicer classes offered by BPU.  BPU required employees to take this class before becoming Cable Splicer Helpers, a position in which Plaintiff showed interest.  A white employee with less seniority was given entry instead.  Plaintiff was, however, given entry into the second class, a class which never took place because the BPU ceased splicing lead cable, rendering the class irrelevant to advancement within the company.

Before the class became unavailable, BPU's practice had been to place the Cable Splicer Helper position up for bid, awarding it to the employee with the most seniority who bid on it. Plaintiff would have been eligible to receive it based on his seniority if no other more senior BPU employees bid for the position as well.  Plaintiff applied for the position on March 19, 2013.  The position was awarded to another applicant.  Plaintiff did not bid for the position again.  Between 2018 and 2020, BPU never posted the position for bid.

Finally, Plaintiff contends that he experienced discrimination when BPU allegedly delayed giving him the Equipment Operator A position.  Plaintiff initially expressed interest in the position sometime before 2018.  In 2018, Plaintiff learned that the BPU was planning to eliminate the position altogether.  Therefore, BPU did not post the position for bid between 2018 and 2020. However, in 2021, BPU decided to continue the position and put it up for bid.  Before posting the position, Darrick Spears texted Plaintiff to let him know that the position would be available soon.

---

[1] The facts are stipulated facts taken from the Pretrial Order (Doc. 34), uncontroverted facts, or where controverted, stated in the light most favorable to Plaintiff, the party opposing summary judgment.

Spears did not text anyone else about the position.  At that time, Plaintiff successfully placed his bid to become an Equipment Operator A, a position he holds to the present day.

The crux of this case began in 2020 when Plaintiff bid to enter the Apprentice Program to become a Lineman.  The Apprentice Program requires 8,000 hours working as an apprentice lineman before the employee becomes a journeyman lineman.  The Apprentice Standards lay out necessary skills and guidelines for working as a lineman.

After successfully passing the written and physical examinations, Plaintiff entered the "Pole Yard."  The Pole Yard is a ten-day program structured as a sort of bootcamp for employees intent on becoming apprentice lineman.  The Pole Yard has a high dropout rate because of its difficulty.  At the time Plaintiff entered the Pole Yard, the instructors were Michael Caudle and David Westfall.  The Apprentice Committee, in charge of determining whether an employee continues in the Apprentice Program, consisted of Darrick Spears, Tony Marin, Mike Fergus, Michael Caudle, Scott Lampson, and Brian McCully.  Plaintiff's union appointed the latter three members to the committee.  There is no dispute that Caudle and Westfall considered Plaintiff a personal friend and each wanted him to succeed in the Apprentice Program.

An incident occurred during Plaintiff's time in the Pole Yard upon which Plaintiff relies to show a racially motivated animus.  Plaintiff dropped his rope which was an infraction of the Pole Yard rules.  Because of this, Plaintiff was given "up-downs" as a disciplinary measure, requiring him to climb up and down a pole.  A white classmate of Plaintiff's, Josh Cook, similarly dropped his rope.  However, Cook was not given up-downs because he was tired from climbing already and Caudle did not want to injure or exhaust him.  Caudle told Cook that he owed Caudle up-downs, but he forgot to make Cook do up-downs after Cook had rested.  It is undisputed that Plaintiff received more up-downs than anyone else in his class.

Another incident relied upon by Plaintiff to show age discrimination occurred when Plaintiff used a pole saw to saw off a crossarm, finishing well before any of the other apprentices. Observing Plaintiff's success, Westfall yelled at the others, "Oh, my freaking gosh, oh, my freaking gosh, you guys ought to be so embarrassed of yourselves because you just got beat by a senior citizen." One of the others in the class asked Plaintiff how old he was. Upon learning Plaintiff's age, the other students stated that he should be retired or in an office.

Plaintiff was under the impression that the only requirement to graduate from the Pole Yard was that he had to climb the 65-foot pole. This impression was supported by a former Pole Yard instructor. At some point in the Pole Yard, Plaintiff successfully climbed that pole.

When Plaintiff entered the Pole Yard, however, Westfall and Caudle completed daily evaluations of each apprentice to measure the performance and improvement of apprentices in the Pole Yard. These evaluations ranked each apprentice on a scale of one to five in six categories: (1) climbing and dexterity; (2) hand tools; (3) materials; (4) initiative; (5) conscientiousness of workmanship; and (6) overall attitude. The instructors also assigned an overall score to everyone. These overall scores were not an average of the other scores but rather an overall assessment of the apprentice's progress. It is undisputed that climbing was one of the most important skills, more important than attitude, for example. To their students, the Pole Yard instructors stressed that climbing was the most important factor from day one. However, achieving a good score in climbing required not just climbing quickly but showing improvement each day.

Plaintiff remained in the Pole Yard for seven of the ten days. During that time, he received the following scores:

|  | 3/5/20 | 3/6/20 | 3/9/20 | 3/10/20 | 3/11/20 | 3/12/20 | 3/13/20 |
|---|---|---|---|---|---|---|---|
| Climbing and Dexterity | 2 | 2 | 2 | 2 | 2 | 2 | 2 |

| Hand tools | n/a | 3 | 2 | 3 | 3 | 3 | 3 |
|---|---|---|---|---|---|---|---|
| Materials | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Initiative | 4 | 4 | 3 | 4 | 3 | 4 | 3 |
| Conscientious of workmanship | n/a | 3 | 3 | 3 | 3 | 3 | 4 |
| Overall attitude | 4 | 4 | 4 | 5 | 4 | 4 | 4 |
| Overall score | 3 | blank | 2 | 2 | 2 | 3 | blank |

Despite Plaintiff's apparent efforts, he did not show any improvement in climbing and dexterity, hand tools, or materials.  Still, Plaintiff testified that he was not the slowest in the Pole Yard, at least not all the time.

Only one of Plaintiff's classmates, Zach Crosthwait, received similarly low scores.  Crosthwait is Caucasian.  His scores for the five days he remained in the Pole Yard were:

| | 3/5/20 | 3/6/20 | 3/9/20 | 3/10/20 | 3/11/20 |
|---|---|---|---|---|---|
| Climbing and Dexterity | 2 | 3 | 2 | 2 | 2 |
| Hand tools | n/a | 2 | 2 | 2 | 2 |
| Materials | 3 | 3 | 3 | 4 | 3 |
| Initiative | 4 | 4 | 3 | 4 | 3 |
| Conscientious of workmanship | n/a | 3 | 3 | 2 | 2 |
| Overall attitude | 4 | 4 | 4 | 5 | 4 |
| Overall score | 3 | 3 | 2 | 2 | 2 |

Although each of the students struggled with climbing the first day, most (meaning all except Plaintiff and Crosthwait) showed improvement throughout the course of the Pole Yard.

Spears, Caudle, and other members of the Apprentice Committee personally observed the students' progress.  On March 10 or 11, Spears met with both Plaintiff and Crosthwait, informing them that they would have to improve their climbing skills by March 13.  Although Plaintiff showed effort after this conversation, he did not significantly improve.  The Apprentice Committee specifically discussed both Plaintiff's and Crosthwait's progress, coming to a consensus that neither would be allowed to continue in the Pole Yard due to their poor performance.  Before the Apprentice Committee officially voted to remove Crosthwait, Crosthwait left the program.  On the

evening of March 12, he Apprentice Committee voted unanimously to remove Plaintiff from the Pole Yard.  Although Westfall did not have a vote, he had input into the decision as the assistant instructor.  That decision was difficult for several members of the Committee because of their personal friendship with Plaintiff.  Spears informed Plaintiff of the Apprentice Committee's decision on March 13 after Plaintiff finished training for the day.

Upon removal from the Pole Yard, Plaintiff filed an EEOC charge alleging racial and age-based discrimination on behalf of Defendant.  The EEOC charge began by stating that Plaintiff "[had] been denied opportunities for career advancement."  It went on to specifically describe the incident with Cook and the up-downs as well as Plaintiff's entry into and subsequent removal form the Pole Yard.  The EEOC charge made no mention of the lead splicing class, the Cable Splicer Helper position, nor the Equipment Operator A position.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[2]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[3]  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[4] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[5]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—

---

[2] Fed. R. Civ. P. 56(a).

[3] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[4] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[5] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

conclusory allegations alone cannot survive a motion for summary judgment.[6]   Furthermore, the "content or substance of the evidence must be admissible" at trial.[7]   Inadmissible hearsay, for example, "is not suitable grist for the summary judgment mill."[8]   The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[9]

### III.   Analysis

As an initial matter, Plaintiff relies on a transcript of a recorded conversation between Plaintiff's attorney and Crosthwait contained within a declaration by Plaintiff's attorney. Defendant has objected to the Court's reliance on the transcript on summary judgment because the Crosthwait's statement within the transcript constitutes inadmissible hearsay.

"To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury."[10]   However, "[t]his does not mean that summary judgment evidence must be submitted in a form that would be admissible at trial."[11]   A common example of evidence relied upon at summary judgment yet usually inadmissible at trial are affidavits.[12]   Nevertheless, "[t]he requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or

---

[6] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[7] *Swift-Eckrich, Inc. v. Advantage Sys., Inc.*, 55 F. Supp. 2d 1280, 1286 (D. Kan. 1999); *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir.1995) (further quotations and citations omitted).

[8] *Rowe v. United Airlines, Inc.*, 62 F. Supp. 3d 1225, 1231 (D. Colo. 2014), *aff'd*, 608 F. App'x 596 (10th Cir. 2015) (further quotations and citations omitted).

[9] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

[10] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006); *see also Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995) ("It is well settled in this circuit that we can consider only admissible evidence in reviewing . . . summary judgment.").

[11] *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (further quotations and citations omitted).

[12] *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016), *as amended on reh'g* (Nov. 8, 2016)

content of the evidence, into an admissible form."[13]   When a party submits a hearsay statement without any affidavit showing that the evidence will be presented in admissible form at trial, the court will not consider the statement at summary judgment.[14]

Here, the transcript of the recorded conversation with Crosthwait would be inadmissible hearsay.[15]  Plaintiff has pointed to no hearsay exception that would make this statement admissible. The Court finds that none would apply.  Without an applicable hearsay exception, the burden remains on Plaintiff to show that this evidence will be admissible at trial.  Plaintiff has neglected to show it could put the substance of Crosthwait's statement into admissible form.  Therefore, the Court will not consider Crosthwait's statement when deciding Defendant's Motion.

**A.      Plaintiff failed to exhaust the administrative remedies for each charge except the Apprentice Program.**

"A plaintiff normally may not bring a Title VII action based upon claims that were not part of a timely-filed EEOC charge for which the plaintiff has received a right-to-sue-letter."[16] Although failure to timely file a charge is not a jurisdictional bar to courts hearing the plaintiff's claims, the defendant may raise failure to exhaust administrative remedies as an affirmative defense.[17]  Defendant here has raised Plaintiff's failure to file EEOC charges regarding the lead splicer class, the Cable Splicer Helper position, and the Equipment Operator A position as an affirmative defense.

---

[13] *Id.* (further citations and quotations omitted); *see also* Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.").

[14] *See Brown*, 835 F.3d at 1232–33; *Johnson v. Weld Cty.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

[15] *See* Fed. R. Evid. 801(c) (defining hearsay as an out of court statement offered to prove the truth of the matter asserted).

[16] *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1181 (10th Cir. 2018) (quoting *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1194 (10th Cir. 2004) (further quotations omitted).

[17] *Id.* at 1185.

Generally, an EEOC charge must include "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practice."[18]  However, an otherwise lacking charge will suffice if it is "sufficiently precise to identify the parties, and to describe generally the action or practices complained of."[19]  Courts must "liberally construe charges filed with the EEOC in determining whether administrative remedies have been exhausted as to a particular claim."[20]  Nevertheless, the plaintiff must describe "discriminatory *acts*" sufficient to reasonably lead to an investigation of those acts and put the defendant on notice.[21]  "[T]he charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim."[22]  This is because "each discrete incident of alleged discrimination or retaliation constitutes its own unlawful employment practice for which administrative remedies must be exhausted."[23]  In other words, "a continuing violation theory . . . is not permitted for claims against discrete acts . . . . Thus, a claimant must file a charge of discrimination within the appropriate limitations period as to each such discrete act of discrimination that occurred."[24]

For example, in *Manning v. Blue Cross & Blue Shield of Kansas City*,[25] the Tenth Circuit held that the plaintiff's EEOC charge was too vague to give the defendant notice of the challenged conduct.[26]  In her charge, the plaintiff claimed "she was treated unequally and was denied

---

[18] 29 C.F.R. § 1601.12(a)(3).

[19] *Id.* § 1601.12(b).

[20] *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007).

[21] *Id.* (emphasis in original).

[22] *Id.* (further citations and quotations omitted).

[23] *Id.* (further citations and quotations omitted).

[24] *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1184 (10th Cir. 2003) (citing *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 111 (2002)).

[25] *See* 522 F. App'x 438 (10th Cir. 2013).

[26] *Id.* at 441

employment opportunities due to her race and national origin, retaliated against in violation of her rights, was not offered reasonable accommodation for diabetes and her history of carpal tunnel and blood clots."[27]  The Tenth Circuit held that "[t]hese charges completely lack any factual specificity, failing even to describe the particular actions and practices complained of."[28]  The charges, therefore, were "insufficient to meet the exhaustion requirement."[29]

Here, Plaintiff has alleged racial discrimination based on four scenarios: (1) Defendant's failing to give him seniority over a fellow employee when it came to the lead class; (2) Defendant denying Plaintiff the Cable Splicer Helper position; (3) Defendant delaying in giving Plaintiff in the Equipment Operator A position; and (4) Defendant eliminating Plaintiff from the Pole Yard. Plaintiff's EEOC charge adequately lays out the facts relating to the fourth scenario over the course of four paragraphs.  However, Plaintiff does not at all mention the lead class, the Cable Splicer Helper position, or the Equipment Operator A position.

In his response, Plaintiff points to a single sentence as evidence that he adequately described the facts underlying those omitted claims.  That sentence reads, "[d]uring my employment, I have been denied opportunities for career advancement."  This is even more vague than the EEOC charge found inadequate in *Manning*.  Like the plaintiff in *Manning*, Plaintiff did not describe any specific facts, dates, actions, or practices which the Court could liberally construe as relating to Plaintiff's omitted claims.  Nothing about the statement "I have been denied career opportunities" would have prompted an investigation into the lead class, Cable Splicer Position, or the Equipment Operator A position, much less put Defendant on notice of its actions. Furthermore, the only dates Plaintiff alleges in his charges are April 2008 through the present.

---

[27] *Id.*

[28] *Id.*

[29] *Id.*

Such a broad period without explanation makes the charge even more vague and would not put Defendant on notice as to the specific actions of which Plaintiff now complains.   Therefore, Plaintiff's claims relating to those factual scenarios must fail because Plaintiff failed to exhaust his administrative remedies.

**B.      Plaintiff's claim under 42 U.S.C. § 1981 and Title VII fails because Plaintiff does not show that he was treated less favorably than others not in his protected class.**

"In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII."[30]  In either case, if the plaintiff lacks direct evidence of discrimination, the burden-shifting framework of the *McDonnell Douglas Corp. v. Green*[31] decision governs whether a plaintiff can survive summary judgment.[32]  First, the plaintiff must establish a prima facie case of discrimination.[33]  "Only after the plaintiff clears this initial hurdle does the burden shift to the employer to prove a 'legitimate, non-discriminatory reason for the adverse employment action.' "[34]  Finally, should the employer carry its burden, the plaintiff must "introduce evidence that the stated nondiscriminatory reason is merely a pretext."[35]

*1.      Plaintiff has not established a prima facie case of racial discrimination*

To establish a prima facie case of discrimination, a plaintiff must show: "(1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she qualified for

---

[30] *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (quoting *Baca v. Sklar*, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005)).

[31] 411 U.S. 792 (1973).

[32] *See* 411 U.S. 792 (1973); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002) ("In cases brought under Title VII and the ADEA where circumstantial evidence is the basis for the claim, our analysis at the summary judgment stage is governed by the burden-shifting framework laid out in *McDonnell Douglas*.").

[33] *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

[34] *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) (quoting *Khalik*, 671 F.3d at 1192).

[35] *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019) (further quotations and citations omitted).

the position at issue, and (4) she was treated less favorably than others not in the protected class."[36] Plaintiff relies on Defendant's denial to him of the Cable Splicer Position, giving a less senior placement in the lead class, the delay in obtaining the Equipment Operator A position, and removing him from the Pole Yard.  As discussed above, Plaintiff has failed to exhaust his administrative remedies regarding the first three alleged instances of discrimination.  Therefore, the Court will examine solely whether Plaintiff's removal from the Pole Yard establishes a prima facie case of racial discrimination.

Defendant does not dispute that Plaintiff, as an African American, satisfies the first element.  Regarding the second, "[a]n adverse employment action includes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[37]  Here, the adverse action at issue is Plaintiff's removal from the Pole Yard.  Once again, Defendant does not dispute that this constitutes an adverse employment action under federal law.

Rather, their dispute centers around elements three and four—whether Plaintiff was qualified for the Apprentice Program and whether he was treated less favorably than his classmates.  Surprisingly, Plaintiff spends little time in his brief addressing these issues.  He argues solely that whether Plaintiff could perform the "necessary requirements of the Lineman position" presents a genuine issue of material fact and that the decision to remove Plaintiff from the class was "based on the 'feelings' of the instructors."  In arguing his prima facie case, Plaintiff does not address whether he was treated less favorably than others not in his protected class.

---

[36] *Khalik*, 671 F.3d at 1192; *see also Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981) (plaintiff's burden establishing disparate treatment prima facie case not onerous).

[37] *Davis v. Unified Sch. Dist. No. 512*, 799 F. App'x 566, 569 (10th Cir. 2019) (further quotations and citations omitted).

Drawing all reasonable inferences in favor of Plaintiff, a genuine dispute of material fact exists as to whether Plaintiff was minimally qualified to continue in the Apprentice Program. At the prima facie stage, it is irrelevant "whether an employee or potential employee is able to meet all the objective criteria adopted by the employer."[38] Rather, the primary inquiry is "whether the employee has introduced some evidence that she possesses the objective qualifications necessary to perform the job sought."[39] The plaintiff's only prima facie burden is "demonstrating that she does not suffer from an absolute or relative lack of qualifications."[40] "[S]ubjective qualifications . . . are more properly considered at the second stage of the *McDonnell Douglas* analysis and a plaintiff's failure to meet such qualifications cannot be used to defeat the plaintiff's prima facie case."[41]

Defendant points to no objective criteria which Plaintiff failed to achieve. Rather, the decision to remove Plaintiff from the Pole Yard appears to be largely subjective. Whether Plaintiff failed to meet Defendant's subjective criteria is a matter best addressed at step two in the *McDonnell Douglas* analysis. At this initial step, Plaintiff has introduced at least some evidence that he possessed the objective qualifications to perform the Lineman position. He was able to climb, use tools, learn some of the materials, and successfully climbed the 65-foot pole. Drawing all reasonable inferences in favor of Plaintiff, a reasonable jury could determine that, at least at the prima facie stage, Plaintiff was qualified to continue in the Pole Yard.

---

[38] *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000).

[39] *Id.*

[40] *Id.* at 1193–94 (quotations omitted).

[41] *Id.* at 1194; *see also Burrus v. United Tel. Co. of Kan.*, 683 F.2d 339, 342 (10th Cir. 1982) ("Objective job qualifications are best treated at step one and subjective criteria, along with any supporting evidence, are best treated at the later stages of the process. To do otherwise would in many instances collapse the three step analysis into a single initial step at which all issues would be resolved. This would defeat the purpose underlying the McDonnell Douglas process.") (further citation and quotations omitted).

Therefore, the main inquiry at this stage is whether Plaintiff was treated less favorably than similarly situated employees not in his protected class.[42]  "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."[43]   In the racial discrimination context, plaintiffs must show that "similarly-situated [non-African American] employees who engaged in similar conduct as plaintiff were treated differently."[44]  However, "if the plaintiff's evidence that she was treated differently than other, similarly-situated employees is 'trivial or accidental or explained by a nondiscriminatory motive,' this evidence does not create an inference of discrimination."[45]

For example, a sister court in the Tenth Circuit found that an African-American plaintiff failed to show disparate treatment when she received a written warning for poor performance.[46]  A non-African American received an identical warning for a same issues.[47]  Therefore, the court had no trouble in quickly determining that there was no genuine dispute of material fact that the plaintiff was not treated less favorably than others outside her protected class.[48]

Here, the parties agree to that Crosthwait, a Caucasian, is the most similarly situated employee in that his performance scores most resembled Plaintiff's.  Plaintiff points to his testimony that he was not the slowest climber in an attempt to show that others where in a similar position as himself.  However, he does not controvert the fact that he and Crosthwait were the only

---

[42] *See Khalik*, 671 F.3d at 1192.

[43] *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (further citations and quotations omitted).

[44] *Renner v. Menninger Clinic, Inc.*, 2003 WL 23498389, at *6 (D. Kan. 2003).

[45] *Smith v. Okla. ex rel. Tulsa Cnty. Dist. Att'y*, 245 F. App'x 807, 813 (10th Cir. 2007) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000)).

[46] *Woods v. Comfort Dental E. Aurora*, 2012 WL 1890434, at *4 (D. Colo. 2012), *report and recommendation adopted*, 2012 WL 1890444 (D. Colo. 2012) (showing plaintiff had been surfing the internet, taking personal calls, and failed to follow procedure in filing and retrieving files).

[47] *Id.*

[48] *Id.* at *5.

two climbers who failed to show improvement in their scores. Likewise, Plaintiff and Crosthwait failed to show any improvement in using their hand tools. Spears spoke with both to tell them they needed to improve their climbing by March 13. The Apprentice Committee discussed Plaintiff and Crosthwait, coming to a consensus that each would need to be removed from the Pole Yard if they did not progress. Neither showed any progress in the primary areas of concern.

The only difference between them is that Crosthwait voluntarily quit the Apprentice Program whereas Plaintiff was told to leave. There is no genuine dispute that had Crosthwait not left the Pole Yard of his own volition, he would have been asked to leave just like Plaintiff. Plaintiff does not present evidence of any other individual with similarly low scores who was allowed to continue in the Pole Yard.[49] Therefore, Plaintiff has failed to show that by being removed from the Pole Yard he was treated less favorably than others not in his protected class.

Plaintiff's brief when discussing pretext argues that disparate treatment was evident when he received up-downs for removing his rope while Cook, a Caucasian, did not. This argument fails to consider that receiving up-downs was not an adverse employment action. Although not explicitly stated by the Tenth Circuit, courts applying the four-element prima facie test under *Khalik* analyze disparate treatment only in the context of the adverse employment action that forms the basis of the plaintiff's case.[50] Therefore, any disparate treatment regarding the up-downs is irrelevant to Plaintiff's prima facie case. It *might* be relevant to whether Defendant's decision to

---

[49] Plaintiff mentions Gilbert Garrett, a white apprentice lineman who is "struggling" in his current position but has been allowed to continue. However, Plaintiff does not contend that Gilbert struggled in the Pole Yard or received poor scores there, only that he is struggling in his current position outside of the Pole Yard. Therefore, Garrett is immaterial to Plaintiff's case.

[50] *See, e.g.*, *Mar v. City of Wichita*, 2022 WL 2229949, at *10 (D. Kan. 2022) (contrasting only the alleged adverse employment action, written reprimands, with similarly situated employees and finding a lack of disparate treatment); *Mitten v. Novartis Pharms. Corp.*, 2022 WL 3577360, at *7 (D. Kan. 2022) (analyzing disparate treatment solely in context of adverse employment action); *see also Glapion v. Jewell*, 673 F. App'x 803, 806 (10th Cir. 2016) (applying different three-element test regarding "inference of discrimination" yet still restricting analysis to complained-of adverse employment action).

remove Plaintiff was motivated by a discriminatory animus under step three of the *McDonnell Douglas* analysis.  But at this initial stage, that issue is not before the Court.[51]

More importantly, it is undisputed that Plaintiff's leaving his rope on the ground had nothing to do with his dismissal from the Pole Yard.  The record is clear that this was an isolated incident for which Plaintiff received discipline in the form on up-downs and which was not further held against him in his daily evaluations.  Therefore, the fact that another employee outside of Plaintiff's protected class did not receive up-downs for the same infraction is immaterial to Plaintiff's claim.[52]

Plaintiff may argue that his testimony that he was given more up-downs than anyone else in his class shows disparate treatment.  This argument fails because Plaintiff neglects to present any evidence that he was given more up-downs than similarly situated employees who were not in his protected class.  In other words, he fails to present any evidence, besides the incident with Cook, that others committed the same infractions as Plaintiff yet failed to receive up-downs as discipline.  Therefore, the unsupported fact that Plaintiff received more up-downs is not evidence of disparate treatment, nor could it as a matter of law give rise to an inference of discrimination.

---

[51] The Court is aware that there is some discrepancy within the Tenth Circuit as to whether the "inference of discrimination" analysis falls under the prima facie case or the pretext prong of the *McDonnell Douglas* test.  *See Luke v. Hosp. Shared Servs., Inc.*, 513 F. App'x 763, 766 (10th Cir. 2013) ("Some of our cases treat circumstances suggestive of discrimination as an element of a prima facie case; other cases treat these circumstances as part of the subsequent inquiry into pretext."); *see also Owens v. Unified Gov't of Wyandotte Cnty./Kansas City, Kansas*, 2022 WL 2131117, at *9 (D. Kan. June 14, 2022) (using different elements under *McDonnell Douglas* test than *Khalik* and analyzing inference of discrimination in prima facie case).  Given the option by the Tenth Circuit, the Court believes the inference of discrimination analysis fits more closely under the third step in the *McDonnell Douglas* test; that is, when determining whether a defendant's given reasons are truly a pretext, as that inference is the main issue at that step.  Furthermore, both of the parties have briefed the issue referring to overall disparate treatment of Plaintiff in the context of the pretext analysis, not the prima facie case, showing that they believe the issue is best addressed there.  Regardless, the Court here finds that the facts under either analysis are insufficient as a matter of law to raise an inference of discrimination.

[52] Even if this incident were enough to establish Plaintiff's prima facie case, it is undisputed that Caudle intended to punish Cook when he was no longer tired, told him so, and forgot about it.  Therefore, this disparate treatment is sufficiently explained by a nondiscriminatory motive, a motive which Plaintiff fails to show as pretext.

Without any other evidence of disparate treatment, Plaintiff does not show that he was treated less favorably than his white companions.  Plaintiff's burden in showing a prima facie case is not onerous.  Neither is it trivial.  Where, as here, Plaintiff has failed to show that there is a genuine dispute as to whether Plaintiff received disparate treatment regarding his dismissal from the Pole Yard, Defendant is entitled to summary judgment on Plaintiff's racial discrimination claim.

**C.    Plaintiff's claim under the ADEA fails because he cannot show disparate treatment nor a causal nexus between his age and his dismissal from the Pole Yard.**

Without direct evidence of age discrimination, a claim under the ADEA employs the same *McDonnel Douglas* burden-shifting framework as race or gender discrimination claims.[53] Therefore, a plaintiff's prima facie case must establish: "1) she is a member of the class protected by the ADEA; 2) she suffered an adverse employment action; 3) she was qualified for the position at issue; and 4) she was treated less favorably than others not in the protected class."[54]  Moreover, a claim under the ADEA brings with it a "heightened evidentiary requirement."[55]  The plaintiff must prove that age "was the factor that made a difference" in the employer's decision to undertake the adverse employment action.[56]  In other words, a plaintiff may only prevail if he shows the adverse employment action would not have occurred "but for the plaintiff's age."[57]

Here, Plaintiff's prima facie ADEA claim fails for the same reason his Title VII claim fails—Plaintiff was not treated less favorably than other younger members performing at a similar

---

[53] *See Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1278 (10th Cir. 2010).

[54] *Id.* at 1279.

[55] *Id.* at 1278.

[56] *Id.* at 1277.

[57] *Konzak v. Wells Fargo Bank, N.A.*, 492 F. App'x 906, 909 (10th Cir. 2012); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) ("Our inquiry therefore must focus on the text of the ADEA to decide whether it authorizes a mixed-motives age discrimination claim. It does not.").

level in the Pole Yard.  There is no direct evidence before the Court of Crosthwait's age.  However, viewing the evidence in the light most favorable to Plaintiff and considering that he was the oldest student in the Pole Yard by at least 15 years, a reasonable inference is that Crosthwait was considerably younger than Plaintiff.  Therefore, Crosthwait was not in Plaintiff's protected class. When reviewing Plaintiff's and Crosthwait's nearly identical performance in the Pole Yard, the Apprentice Committee decided to dismiss them both.  Accordingly, Plaintiff cannot show that he was treated less favorably than similarly situated and younger classmates in the Pole Yard. Plaintiff's ADEA claim must fail.

Even if Plaintiff had established each element of his prima facie case, he still cannot show that his age was the "but-for" cause of his removal from the Pole Yard.  First, "age-related comments by non-decisionmakers are not material in showing the [defendant]'s action was based on age discrimination."[58]  Furthermore, "[i]solated remarks, unrelated to the disputed employment action, are insufficient to demonstrate discriminatory animus."[59]

The only age-related comments Plaintiff relies on to show discrimination are a standalone "joke and a dig" by Westfall and comments by his fellow classmates.  There is no genuine dispute that Plaintiff's classmates had no impact on the decision-making process by the Apprentice Committee.  Their remarks are therefore immaterial.  All that remains is Westfall's comment that the other Apprentices "ought to be so embarrassed of yourselves because you just got beat by a senior citizen," referring to Plaintiff.

---

[58] *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994).

[59] *Stover v. Martinez*, 382 F.3d 1064, 1077 (10th Cir. 2004) (speaking in the context of antisemitic claim); *see also Johnson v. Potter*, 2004 WL 2823237, at *9 (D. Kan. 2004), *aff'd*, 156 F. App'x 61 (10th Cir. 2005) (quoting *Stover* in ADEA context).

Doubtless Westfall, despite not having a direct vote, was involved in the decision to remove Plaintiff from the Pole Yard.  Still, that does not mean his would have been the deciding voice.  Nevertheless, Westfall's isolated remark is wholly unrelated to the Apprentice Committee's decision to remove Plaintiff.  From the substance of the remark, that Plaintiff sawed faster than the others, Westfall was pointing out that Plaintiff's success.  Even when viewing the remark in the light most favorable to Plaintiff's case, Westfall addressed the remark to Plaintiff's classmates, not Plaintiff himself.  Furthermore, the remark pertained to Plaintiff using an pole saw to saw off the end of a crossbar.  It did not relate to Plaintiff's lack of improvement regarding climbing, hand tools, and materials, the reasons Plaintiff was removed from the Pole Yard.  In sum, Plaintiff fails to establish any sort of causal nexus between Westfall's isolated remark and the decision to remove Plaintiff from the Pole Yard, much less show that it was the "but for" cause of that decision.  Therefore, Plaintiff's ADEA claim would also fail for lack of a causal nexus between his age and the decision to remove him from the Pole Yard.

**IT IS THEREFORE ORDERED** that Defendants Motion for Summary Judgment (Doc. 38) is **GRANTED.**

**IT IS SO ORDERED.**

This case is closed.

Dated this 7th day of October, 2022.


*Eric F Melgren*

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE